(No. 12774.—Decree affirmed.)
Florence M. McCarthy, Appellant, *vs.* Hannah McCarthy, Appellee.

*Opinion filed October 27, 1919.*

1. Trusts—*resulting trust arises by operation of law.* A resulting trust does not spring from a contract between the parties but arises by operation of law from the acts of the parties.

2. Same—*when a resulting trust arises.* A resulting trust arises where one person has the money of another to invest for the owner, uses the money to purchase land and takes title in his own name.

3. Same—*when evidence is not sufficient to establish resulting trust.* To establish a resulting trust the evidence must be full, clear and satisfactory that the title was taken by the grantee under such circumstances that the trust at once resulted; and where the more reasonable construction of the evidence is that the owner of the money permitted it to be used in the purchase of the property with the understanding that it was to be re-paid him when he wanted it, proof to establish and enforce a resulting trust is not sufficient.

Appeal from the Circuit Court of Cook county; the Hon. Kickham Scanlan, Judge, presiding.

Samuel J. Lumbard, and Thomas F. Monahan, for appellant.

D'Ancona & Pflaum, for appellee.

Mr. Justice Farmer delivered the opinion of the court:

This is an appeal from a decree of the circuit court of Cook county dismissing for want of equity a bill in chancery filed by appellant against appellee. The bill prayed that appellee be decreed to hold in trust for appellant an interest in certain real estate described in the bill, which interest it was alleged was purchased with the money of appellant, and that appellee be required to account for the rents and profits of the premises.

Appellant and appellee are brother and sister, and they, their mother, two other brothers and a sister resided in Chicago. Neither appellant nor appellee has ever been married and appear to have lived with their mother in Chicago until some time in 1902, when appellant went to St. Louis, where he was employed in a leather-belt manufacturing establishment. His wages began at $100 per month and were increased from time to time until 1908, when he was receiving $40 per week. His wages were subsequently increased to $100 per week. Soon after he began work in St. Louis he began sending money to his sister, the appellee. He testified he had no bank account in St. Louis and that he began in 1902 to have her take care of his savings for him. Sometimes the money was sent by registered mail, sometimes in currency by mail without being registered. Appellant testified he had an agreement with appellee to buy property with the money after they had saved $1000, which he supposed would take a couple of years. Although it is not admitted by appellee, we think the proof shows

.reasonably clearly that, all told, appellant sent her $4510. Appellee deposited most of the money received from appellant by her in a savings account in the Hibernian Bank, in her own name.

Appellant's contention is,—and that is the theory of his bill,—that he began sending money to the appellee for safe keeping for his account; that in June, 1908, it was agreed between appellant and appellee that she should purchase a piece of real estate and pay for it with the money of appellant and other members of the McCarthy family; that appellant's money was so used and invested by appellee, and in fraud of his rights the deed to the property was caused by the appellee to be made to herself and her mother, Ann McCarthy, as joint tenants. Ann McCarthy died in June, 1913, and appellee claimed, as survivor, to be the sole owner of the property. Appellant alleges in his bill that he fully believed, expected and intended appellee would take the title to the property purchased in his name in such a way as to protect him for the money he had put in the purchase of it, but without his knowledge or consent the title was taken in the name of appellee and her mother as joint tenants. Appellee's contention is that the transaction between her and her brother was simply a debit and credit transaction; that the appellant sent her from time to time money for safe keeping for him, to be drawn on by him as he found use or need for the money, and that she at his request paid and returned to him all the money he deposited with her.

The property in controversy was purchased by appellee in June, 1908, for $8250. A cash payment of $6900 was made and the property conveyed subject to a mortgage for the remainder. Appellee testified she used $3240 of appellant's money in making the cash payment; that she did this with his knowledge and consent and with the understanding between them he could have his money back at any time he called for it. The correspondence between ap-

pellant and appellee shows that appellant knew of the negotiations for and the purchase of the property and permitted appellee to use his money in making the cash payment. The real controversy is whether, as claimed by appellee, the use of appellant's money was a mere temporary accommodation, the amount so used to be returned to him when called for, or whether, as claimed by appellant, he was entitled to an interest in the property and entitled to it in proportion to the amount of money invested in it.

The law is well settled that a resulting trust does not spring from a contract between the parties but arises by operation of law from the acts of the parties. Where one person has the money of another to invest for the owner and uses the money to purchase land and takes title in his own name, the law will hold him to be a trustee for the owner of the money used in buying the land. Appellant testified that he began in 1902 sending his money to appellee to take care of for him; that she informed him she deposited it in the bank in her own name, and from time to time he drew against the fund; that at his request she paid his insurance dues to the Maccabees, which she says was $1.90 per month. He testified he drew $500 in 1903 or 1904, and about 1906 he agreed to loan Frank Murphy $100, and at his request the appellee let Murphy have the money. This, as we understand his testimony, is all he claims to have drawn from the fund deposited with appellee prior to the purchase of the property, in June, 1908. He testified that in 1911 appellee at his request sent him $2450, and those amounts are all he claims to have drawn out of the fund deposited with appellee. Appellee's testimony is not at all clear as to how much of the fund she returned to appellant. Whether she claims to have returned to him $3552.40 or $4002.40 we cannot understand from her testimony. It was one amount or the other. If the first named sum is the correct amount she returned to appellant she still has in the neighborhood of $1000 of his money;

if it was the last named sum, she still has about $500 of his money. According to the testimony of appellant the amount paid him by appellee is between $1500 and $1600 less than the amount he deposited with her.

January 3, 1911, which was about two and a half years after the property was purchased, appellant wrote appellee to send him all the cash she had, as he wished to use it to pay for stock in the concern he was working for. He wrote: "You have the bank send me a check, as that will be the safest way. Now, Sis, I don't think you ought to take it all out. You may leave a balance, but send me all you can; and tell Dan to save all he can, as we will all benefit by this transaction." On January 6, 1911, appellant wrote appellee that in the next two or three months he might want her to raise $3500; that the money he had "put with you, Dan and mother is not giving me any interest at all;" that the money could be raised by mortgaging the property, which he referred to as "the new home," which he did not want to mortgage if it could be arranged in some other way, and that he would try to otherwise arrange it. On July 6, 1911, Snydacker & Co., bankers in Chicago, sent appellant a check for $2450 in a letter stating, "at the request of your mother, sister and brother we herewith send you check for $2450." Appellee appears to have written appellant about the time the check was sent, but her letter was not introduced in evidence. She testified she wrote appellant that the $2450 was all that was coming to him, and that he did not reply to the letter. Appellant testified he had no recollection what she said about it; that he believed she said something to the effect that the check squared the account with him, but he did not remember. On June 25, 1911, appellant wrote his brother Dan that in reply to his request of appellee for $3000 he had received an answer which he never expected. He stated he had never worried about putting his money in the new home. "I put it in willingly and never thought there would be a ques-

289 — 24

tion at all if I wanted the amount I asked for, as I want to put it in this business, as I am getting along where I have to see some kind of an income for myself when a few more years creep over my head."

Something near forty letters from appellee to appellant about the receipt of money from him and concerning the purchase of the property were introduced in evidence. They admit the money of appellant was used in paying for the property. They are to some extent incoherent, but we fail to find in any of them any clear statement that the money of appellant was to be used in paying for the property as an investment for him. But few letters written by appellant were put in evidence, but what he did write, considered in connection with the letters of appellee, indicates that the understanding was to use his money in paying for the property but it was to be returned to him when he called for it. In March, 1910, appellee wrote appellant about how much of his money had been used in buying the property, and said: "The money of yours is safe. You don't need to be afraid. You'll get all is coming and more with it. * * * Your money is here, Flor, and you needn't be afraid of your money. It's safe." In January, 1911, which was long after the property was purchased, appellant wrote appellee a letter asking her to send him all she, her mother and Dan had on hand; that she have the bank send it by check, and suggested "you need not take it all out; you may leave a balance, but send me all you can." A few days later he wrote he would in the next two or three months want about $3500, and suggested, if necessary to do so, the property be mortgaged to secure it. In June, 1911, appellant wrote his brother he willingly put his money in the purchase of the property and never thought there would be any question if he wanted it; that he wanted to invest it in the concern he was working for; that he was only asking for his own and hoped he would not have to ask for it again. Appellee sent him, through Syndacker &

Co., $2450 in July, 1911. While the evidence does not support the claim of appellee that that sum and the previous amounts appellant had drawn was all he had sent her, the proof seems more consistent with appellee's contention that the money deposited with her by appellant and which was invested in the property was used by his consent with the understanding it was to be re-paid him when he wanted it, than it is with appellant's contention.

The evidence to establish a resulting trust must be full, clear and satisfactory that the title was taken by the grantee under such circumstances that the trust at once resulted. (*Francis* v. *Roades,* 146 Ill. 635.) This court said in *Goelz* v. *Goelz,* 157 Ill. 33: "The rule is well settled that where the evidence is doubtful and not entirely clear and satisfactory, or is capable of reasonable explanation upon theories other than that of the existence of an implied or a resulting trust, such trust will not be held to be sufficiently established to entitle the beneficiary to a decree declaring and enforcing the trust." Tested by these rules, which are adopted and applied by the courts of our country generally, it will be seen the evidence falls short of the proof required to establish and enforce a resulting trust. It is true that in some of the letters of appellee to appellant she speaks of the property as "our property" and says appellant's money is in it, but her correspondence, considered as a whole and in connection with the letters of appellant, with the further fact of his drawing on the fund to the extent of about $3000 according to his own testimony, would not warrant us in reversing the decree on the ground that the denial of the relief prayed in appellant's bill was palpably contrary to the evidence. Whatever remedy appellant may have, we are satisfied that under the evidence he was not entitled to the relief prayed in his bill and that the circuit court did not err in dismissing the bill for want of equity.

The decree is affirmed.

*Decree affirmed.*